JOSEPH W. SMITH v. SOUTHERN ILLINOIS & MISSOURI BRIDGE COMPANY, Appellant.—30 S. W. (2d) 1077.

Division One, September 4, 1930.

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for appellant.

*Charles P. Noell* and *Hensley, Allen & Marsalek* for respondent.

LINDSAY, C.—This is an action for damages for personal injuries, wherein the plaintiff had a verdict for $10,000, and defendant appealed from the judgment entered thereon. The suit was brought against appellant, Southern Illinois & Missouri Bridge Company, and also against the Missouri Pacific Railway Company, the St. Louis-Southwestern Railway Company, and the Chicago & Eastern Illinois Railway Company. At the close of plaintiff's case he dismissed as to all the defendants except the appellant.

The plaintiff was employed by appellant as a guard or watchman, on the bridge owned and controlled by appellant over the Mississippi River between Thebes, Illinois, and Illmo, Missouri. Appellant maintained double tracks upon the bridge for the passage of railroad trains. There was a board walk, about three feet wide, running the length of the bridge between said tracks. The bridge extended from east to west. The north one of the two tracks was used for trains moving westward, and the south track for trains moving eastward. The plaintiff's hours of work were from four o'clock in the afternoon until twelve o'clock, midnight. It was one of his duties to follow, on foot, all trains or engines crossing the bridge in either direction, and to see whether anything had fallen on the track— "fire or anything; to see that the track was in order for the next train to come across." At about 10:30 p. m. on July 26, 1924, plaintiff was struck by a train of the Missouri Pacific Railway Company, running westward on the north track. This train was one carrying men from the Missouri Pacific yards in Illinois to Illmo.

and was referred to by a number of the witnesses, railroad men, as the "Bum."

In the period beginning shortly before and at the time of plaintiff's injury, the appellant was replacing rails, and making some repairs of the tracks on the bridge, and had placed a lot of materials upon the walkway on the bridge. The materials consisted of tie plates, rails and angle bars, kegs of spikes, wire, sacks of tie pegs, and the like, and they were on the walk between the tracks, more or less, the full length of the bridge; and, beyond the west end, where plaintiff was, when struck, there were materials between the tracks. From the west end of the steel structure of the bridge, and on the north side of the north track, there extends westward a concrete wall. There was a recess or "pocket" in this wall, near where the wall joined the structure of the bridge proper. A little while before the occurrence of his injury, the plaintiff was in this pocket. His hat was blown off by the wind, and he took his flashlight out of his pocket and with his lantern in his hand walked westward along the north side of the north track, looking for his hat. After some search he concluded the hat had been blown out of the range of his vision, and gave up the search for it. At that time he was on the north side of the north track and twenty-five or thirty feet west of the bridge proper. At about that time, the westbound Missouri Pacific train, on the north track, came upon the east end of the bridge. The plaintiff saw this train, and started to walk directly south across the north track to get upon the south track and out of the way of the train. In attempting to do so, and in stepping from the north track into the space between the tracks, his foot, or, it seems from his testimony, both feet, became entangled in the materials lying between the tracks. Before he could extricate himself or turn his body out of reach, the train was upon him and he was seriously injured.

Plaintiff's amended petition, on which the case was tried, charged negligence against defendants, including this appellant, in two respects: (1) placing and permitting to remain upon the footway between the tracks, the various materials and obstructions mentioned, interfering with the use of said walkway, and rendering the use by plaintiff of the bridge where he was required to and was performing his work, extremely hazardous and unsafe, as defendant knew or could have known, in that, plaintiff's duties required him to walk back and forth across the bridge, and by reason of the obstructions, plaintiff was required to walk upon the tracks; (2) placing and permitting to remain for a long time on the footpath the various materials and obstructions mentioned, thereby rendering the use of the bridge by plaintiff extremely dangerous and unsafe, as the defendants knew or could have known, in that, plaintiff was likely to

stumble or become entangled in said obstructions in the performance of his duty, and be struck by engines or trains operating upon said bridge.

The answer, after a general denial, pleaded contributory negligence on the part of plaintiff, alleging that his injuries were caused by his own failure to exercise ordinary care for his own safety, in that he negligently and unnecessarily crossed the tracks in front of the train, and while crossing said tracks, negligently failed to ascertain the distance said train was from him, or the speed of the train. The reply was a general denial.

The action is not founded upon the Federal Employers' Liability Act, but is one at common law.

The first and chief assignment of error is based upon the refusal of defendant's peremptory instruction offered at the close of all the evidence.

Appellant insists that no actionable negligence or breach of duty on its part was shown, and that plaintiff was guilty of contributory negligence as a matter of law. The determination of the issue raised by the demurrer, carrying these two contentions, will require a more particular statement of certain portions of the evidence.

The floor of the bridge and the near parts of its approach at either end constituted the plaintiff's place of work, and it was there he discharged his duties. He had nothing to do with the work of replacements and repairs. The foundation of plaintiff's claim is the alleged failure of the defendant to exercise ordinary care to furnish plaintiff a reasonably safe place in which to work, and keep the same reasonably safe, and this claim must take into consideration the fact that at the time of his injury defendant was making certain replacements and repairs. Many cases are cited in the brief for respondent upon the subject of the duty of the master to the servant, in respect to the care to be exercised by the master to keep in reasonably safe condition the place or places where the servant is required to be or to go in the discharge of his duties. [Vordermark v. Hill-Behan Lumber Co., 12 S. W. (2d) 498; Cross v. C. B. & Q. Railroad Co., 191 Mo. App. 202; Porter v. Mo. Pac. Railroad Co., 267 S. W. 965; Holloway v. M. K. & T. Ry. Co., 276 Mo. 490, 502; Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173; Edmondson v. Hotels Statler, 306 Mo. 216; Brown v. St. L. & S. F. Ry. Co., 227 S. W. 1069; Koonse v. Standard Steel Works Co., 221, Mo. App. 1231; Johnson v. K. C. Bolt & Nut Co., 172 Mo. App. 214; Bone v. Contracting Co., 191 S. W. 1062; Campbell v. Aunt Jemima Mills Co., 211 Mo. App. 670; Arnold v. Graham, 219 Mo. App. 249; Pyle v. K. C. Light & Power Co., 246 S. W. 979; Soltesz v. J. H. Belz Provisions Co., 260 S. W. 990; Hunter v. American Brake Co., 231

S. W. 659.] It is not necessary to repeat here what was said in those and in similar cases, dealing generally with the question of the duty of the master to furnish a reasonably safe place in which to work.

Upon the immediate question of whether defendant was guilty of actionable negligence, counsel for defendant stress the fact that in this instance, replacements and repairs were being made. Their argument is that cases which deal with injuries caused by slipping or falling over objects on floors or other places where the complainant was required to walk, when such places were not undergoing repairs and the objects causing the fall were not being used in connection with the construction or repairs, are not in point. As the basis of a distinction sought to be made, they say that in cases of the class mentioned, there was no valid reason for the presence of the objects at the place of injury; that in the case at bar the right to take out old materials—rails, tie plates, spikes, binding wire and the like, and replace those materials with new—must be conceded, and that carries with it the necessity of having the new materials on hand, at the place for their insertion in place of the old. Upon this subject our attention is called to what is said in Labatt's Master & Servant (2 Ed.), Vol. III, Sec. 984, p. 2656, referring to cases of injury to employees of railroad companies, caused by objects left near their tracks and having nothing to do with the movements of trains. The author there says: "But it is conceded that the company may, without culpability, allow such articles to remain temporarily near the track, when they are placed there in the ordinary way for the purpose of repairing the track itself." In this case the appellant is not a railway company operating trains, but does maintain this bridge for the passage of railway trains. Hurst v. Kansas City, P. & G. Ry., 163 Mo. 309, is cited in support of the statement just quoted. In that case, a brakeman attempting to board a moving train stumbled over one of several piles of gravel, left near the track preliminary to being used as ballast. The right of the railway company to do the work of ballasting was not questioned, it was said, and it was further said, l. c. 318: "Nor can its right to do the work necessary for that purpose in its own way be doubted, provided, when so doing, it furnishes its servants a reasonably safe place to work." It was next pointed out that under the rule as to furnishing a reasonably safe place in which to work, a distinction was to be made between the employee connected with the work of construction or repair, and the employee not so connected. The deposit in the ordinary way of the gravel for use as ballast, although held to constitute a danger to employees, was held not to be actionable negligence if the gravel was not permitted to remain longer than a reasonable time before its distribution as

ballast. In that case, it was held that permitting it to remain undistributed for more than two weeks was negligence. The plaintiff in that case was denied recovery on the ground that he voluntarily chose the unsafe way of boarding the train while it was in motion, when he had control of its movements, and could have caused it to stop for him. The decision in recognizing the right of the railway company to make repairs and replacements and to have the materials at hand, which, being so placed, add to the dangers of employees having no part in that work, also clearly recognizes that the duty of the employer to furnish a reasonably safe place of work for such employees is not annulled, or suspended, but is to be observed, and is to be measured by the circumstances of the particular case.

The plaintiff's instruction covering the case and authorizing a recovery submitted the case upon the hypothesis that defendant negligently "placed materials, including wire, in the footway," and that in crossing over the track "plaintiff's foot became caught in the wire." Out of this, several contentions are made by defendant related to the branch of the demurrer now being considered. Briefly, these contentions are that there is no testimony to show that plaintiff's foot was caught by wire, and that as to this hypothesis the verdict could be founded only upon conjecture; that even if the plaintiff's foot was caught in the wire—the direct cause of his injury—the placing of the wire where it was, was not shown to have been the result of negligence on the part of defendant; that there is no basis for a conclusion that defendant should have anticipated that plaintiff would walk over such wire or materials without watching and seeing where he was stepping. We notice briefly the cases cited for defendant under the above stated contentions, or phases thereof.

Attention is called to Starkey v. Greenville, 189 Mo. App. l. c. 361. That case is one dealing mainly with the question of what a defendant ought to anticipate. The defendant there was a city of the fourth class; the plaintiff was driving a horse on a street not much frequented; the horse stepped on the end of an oak stick, which was about four feet long and an inch or more in diameter, and the other sharp end of the stick was caused to fly up against and to penetrate the belly of the horse. The decision proceeds upon the theory that a municipal corporation, in the care of its streets, is not an insurer against accidents, and is not under obligation "to provide for everything that *may* happen upon them." The application of the decision is too remote for serious consideration here.

Williams v. Railroad, 119 Mo. 319, is cited. In that case the plaintiff was a switchman and was at work in the defendant's repair yard. He fell, and was injured by a moving train, his fall being

caused by his stepping on a spiral spring lying concealed in the grass near the track. The grass had been permitted to grow at the place for a long time, and the plaintiff had pursued his work without requesting its removal. The decision proceeded upon the theory that the plaintiff knew that, in repair yards, pieces of wood and metal were likely to fall upon the roadbed and be concealed in the grass, which he knew had been permitted to grow there for several years; that under the conditions existing, reasonable inspection (by defendant) would not have discovered the small wire spring upon which the plaintiff slipped, which was coiled up in the matted grass. The place was one permanently used as a repair yard, by defendant, and that fact was emphasized by the court in reaching the conclusion that the plaintiff assumed the risk, and was not entitled to recover. In the case at bar defendant did not plead assumption of the risk; and, the objects, wire and other materials, were placed where they were under the direction of appellant's foreman. The opinion in the Williams case recognizes, on the one hand, the rule that in places given over to the operation of many railroad trains the employee is exposed to dangers from which the highest degree of care on the part of the employer cannot protect him, the risk of which he assumes, and also recognizes the rule that in places of the character mentioned, a greater degree of care is required on the part of the employer, since the duty of the employer must be a relative one, dependent upon the purposes for which the premises are used and the duties required of employees upon them. As was said in the Williams case, supra, l. c. 322: "The duty of the master should be measured and determined by the uses to which premises are applied."

The plaintiff testified that when he went to work for the appellant, the foreman instructed him that when a train was approaching upon one track "to always, if it was possible, get on the other track from the track the train was on." He said that sometimes two trains would be passing in opposite directions, and then he had to get in between them or out to one side, but that the foreman told him "where it was possible, for to always get on the opposite track." This testimony is to be considered along with the testimony concerning the materials placed between the tracks. It is to be considered with reference to the testimony concerning whether wire was placed between the tracks with other material, at the point where plaintiff said he attempted to cross from the north track to the south track, and this, in view of the question submitted by plaintiff's main instruction, in view of the contention of the appellant that there is no evidence that plaintiff's foot was caught in the wire, and in view also of the contention that there was nothing done, or neglected to be done, from which appellant could reasonably anticipate that injury might result to the plaintiff.

In his direct examination plaintiff stated that about the time he concluded he would not be able to find his hat, the Missouri Pacific train "struck the bridge; that he looked around, saw it;" and (continuing his narrative) said: "and I just deliberately turned and walked straight across the bridge, what I was always in the habit of doing, to get on the other side, on the other track from the train. I stepped on this material, it was in between the tracks there, and my foot, it fell over something or other and my foot it went down in there and I couldn't pull it out but it throwed me down, so when I pulled up that a-way my other foot naturally gave, and I didn't go plumb down the first time, I caught myself and got up; and I took a step and my other foot was fastened, it went down in that there too. I was tangled up in there and I could feel like this wire 'round my foot."

On his cross-examination in answer to questions, and describing where he was immediately before he encountered the materials between the tracks, the following appears:

"Q. Your right foot was on the south end of the ties? A. Yes, on the ties.

"Q. It was south of the rail? A. Yes, I reckon it was.

"Q. And then you say you caught yourself and fell backwards? A. I didn't fall down, I didn't get down; I recovered. But I tumbled backwards sorter, and I caught myself and come right up, then I couldn't get my foot out and I tried to get, the other one got hung and I couldn't get either one of them out; there was wire in there, gentlemen."

Farther on in his cross-examination appears the following:

"Q. In what way was your foot caught that it held you so firmly and you say caught? A. Well, I stepped down, stepped on this material, you know, and my foot was right down in among it and, well, I tell you there was wire in there. Now, they wouldn't let me tell what I said to myself, but then there was wire in there.

"Q. Wire in where? A. Wire in there."

A witness, called by plaintiff, testified that he was a lamp tender and watchman upon the bridge, and went over the bridge every day except Sunday; that he went over it in the forenoon and also in the afternoon of the day preceding the time of plaintiff's injury on the night of that day. The witness said that repair work had been going on about two weeks, and that there were materials along on the bridge. He said there were four rails laid end to end between the tracks along or near the west end of the bridge and approach, and that there were materials lying between the tracks of the approach near the west end of the steel structure of the bridge. Of these materials other than rails he mentioned loose bolts or spikes, or plugs; also tie plates. He said that he also saw bonding wire be-

tween the tracks. From his testimony and other testimony it appears that bonding wire used in the replacement of rails comes sometimes in bundles held together by wire. This witness spoke more particularly of seeing tie plates at about the place where plaintiff said he attempted to cross the track, and said he saw old or loose bonding wire along about that place. Defendant's witness Gregory, the bridge foreman, said that the tie plates, part of the materials on hand in this instance, were not strung with wire; but, he also said in his testimony: "Sometimes they do come that way."

Defendant's witness, Tom Carroll, a bridge watchman, testified as to work done in the evening prior to the occurrence of the injury to the plaintiff on that night. This witness told of the placing of four rails on that evening preparatory to their being substituted for old rails in the tracks. According to this witness they took out one old rail on the north main track, and replaced it with a new rail. The testimony of the witness is not clear as to the exact process in making this replacement. He said they did not remove the angle bars, and that the bonding wire was not disconnected or removed from the old rail, but that the old bond wire was hanging on to the old rail. Defendant introduced a number of witnesses whose testimony is in conflict with the testimony for plaintiff, upon details, as to the materials and just where they were. There is some uncertainty, as well as conflict, in the testimony as to the quantity, character and precise location of the materials; but there is substantial testimony that there were materials, including wire, along in the space between the two tracks at the place not far from the west end of the steel structure, and where plaintiff said he attempted to cross. A number of pictures were introduced in evidence and are here as exhibits. These are pictures of the bridge and of the track to the west of the steel structure, some taken from the point near the west end of the bridge—others at a greater distance. There was a good deal of examination of witnesses in connection with these pictures, wherein the witnesses were indicating places, and the precise points are not easily ascertainable. Considering all of the evidence and giving the evidence favorable to plaintiff, the force which must be given in ruling upon the demurrer, we conclude that it was a question for the jury, whether there were wires as well as other materials between the tracks at the place where plaintiff attempted to cross. Also, whether plaintiff's foot was caught in the wires was a question for the jury. It is true the plaintiff did not, in specific and absolute terms, say that his foot caught in the wires, but a finding that his foot was so caught cannot be said to be based merely upon conjecture, under the testimony as to the presence of wire at that place, and considering also the statements of the plaintiff heretofore quoted, to the effect that when his foot went into the materials

he "couldn't pull it out;" that he "was tangled up in there," and, as he said, he "could feel like this wire 'round my foot."

The injury to plaintiff occurred in the night time, and the place was not lighted, except such light as was given by the lantern which plaintiff carried. From ordinary experience, the jury could appreciate the difference in sensation between striking the foot against a wire, or wires, and striking it against a solid object of some bulk; and could likewise appreciate the probability of entanglement which might result from contact with wires, and appreciate also the greater difficulty, especially in the night time, of discovering the presence of wire, and of extrication from it. Under its claim that a finding that wire on the footway caused plaintiff to fall, must be founded wholly upon conjecture, counsel call attention to Marlowe v. Kilgen, 252 S. W. l. c. 426. We do not find that case, the respective facts considered, applicable here. There the plaintiff was working in a kiln for drying lumber. He was attempting to get a stick of lumber which was to be placed upon a pile of lumber. He fell. In that case he said explicitly that he could not tell whether "his foot slipped, or whether the lumber tilted," and did not know what "happened under his foot." He was no more definite than to say he "lost his balance in some way."

There is another thing which may be considered, that is, that under the instructions given to the plaintiff, and the custom and practice, he was expected to get over upon the track from that on which the train was approaching. The testimony of defendant's witness, Tom Carroll, who had been a bridge watchman for defendant for three years, supports the testimony of the plaintiff in the particular mentioned. He testified that in the jostle and lateral motion of trains in passing over the bridge, lumps of coal, rocks or other objects were at times caused to fall, and he said that for that reason watchmen would always go to the opposite side of the bridge from that on which the train was approaching, if it was possible to do so. He said this was the custom and practice all of the time he had worked for defendant. Under the instructions given, and under the custom and practice shown, that the watchman, on the approach of a train, for his own safety should cross over to the other track, the leaving of loose wire or wires connected with materials lying between the tracks, was an undue enhancement of the dangers to which plaintiff and others in like employment were exposed. No sort of warning light was placed upon or about any of these materials. The performance of plaintiff's duties, under the circumstances shown, was attended with danger. Under the duty of the master to exercise ordinary care to furnish the servant a reasonably safe place to work, there is included the duty to use all reasonable

precautions which ordinary prudence would dictate, under the particular circumstances, in respect to the dangers to be reasonably anticipated and likely to occur to the servant in the course of the discharge of his duties. [Knott v. Mo. Boiler & Sheet Iron Works, 299 Mo. 639; and the many authorities there cited.] In this connection may be noted the fact that there is testimony to the effect that the materials other than rails could have been placed in the pockets in the concrete wall extending beyond the steel structure.

The other branch of the demurrer has to do with the claim that the plaintiff was guilty of negligence as a matter of law. As presented by counsel for defendant, that contention falls under two heads. It was pleaded in the answer and is contended here that plaintiff unnecessarily went across the track, the theory being that he went from a place of safety to one of danger. We have already referred to the testimony of plaintiff as to the instructions given to him, and to the testimony of defendant's witness Carroll, as to the danger from being struck by loose objects falling from the train and the custom and practice of the watchmen of always going over, if possible, to the other track. It is suggested in the brief that plaintiff was near one of the pockets in the concrete wall, where he had just before been at the time his hat blew off, and that he could have gone into this pocket when he saw the train approach. That contention is not conclusively supported by the evidence, and cannot be allowed under the testimony of defendant's witness Carroll. He testified on his cross-examination, that it would not be safe to "stand between the concrete wall and the train." He was asked if it would be safe in the pockets. He said: "Well, not hardly . . . A fellow got to watch out about that." The plaintiff cannot be held guilty of contributory negligence as a matter of law because he attempted to pass over to the south track. In doing so he was following not only the instructions given to him, but the custom and practice followed by other employees under like circumstances.

The next contention is that plaintiff in the exercise of ordinary care could and should have seen and avoided the obstructions, and was guilty of contributory negligence in failing to do so.

The plaintiff was sixty-six years old at the time of his injury, and sixty-eight years old at the time of the trial. He had been employed as watchman for six or seven years. According to his testimony, when he concluded that he could not find his hat, he put the flashlight in his pocket. He was then twenty-five or thirty feet west of the west end of the steel structure of the bridge, and while standing there, heard the Missouri Pacific train coming upon the east end of the bridge. He looked, and saw the headlight. He started to walk, "deliberately," he says, across the south track. The distance be-

tween the inner rails of the two tracks was eight feet. The length of the bridge is given as 2700 feet. According to his testimony, at the time his feet were caught in the materials near the south rail of the north track, the train was midway of the bridge, or perhaps a thousand feet, or less, away. After becoming entangled, and seeing the near approach of the train, he describes himself as being "scared." As the train drew near, he said his head was somewhat toward the west, and he threw his body as far to the south as he could, but was struck by some part of the engine and his hips crushed. No point is made on appeal as to the seriousness of the injury, or, that the verdict is excessive. The point stressed by defendant is that he knew there were materials between the track; and, incidentally, reference is made to the fact that plaintiff did not use his flashlight, as well as his lantern, in his attempt to cross to the other track.

Counsel for defendant call particular attention to certain testimony given by the plaintiff on cross-examination.

"Q. Your right foot was on the south end of the ties? A. Yes, on the ties.

"Q. It was south of the rail? A. Yes, I reckon it was.

"Q. And then you say you caught yourself and fell backwards? A. I didn't fall down, I didn't get down; I recovered. But I tumbled backwards sorter, and I caught myself and come right up, then I couldn't get my foot out and I tried to get, the other one got hung and I couldn't get either one of them out; there was wire in there, gentlemen. . . .

"Q. Now, you have no recollection of seeing any material along there that evening when you were over there before sundown? A. No, I never paid any attention to it.

"Q. When did you see that material that night? A. When I stepped on it.

"Q. Was that the first time you saw it? A. No, that's not the first time I saw it, but the thing has gone from me, I tell you.

"Q. Did you have your lantern with you? A. Yes.

"Q. Was there anything to prevent you from seeing it with your lantern or flashlight if it was there? A. No, but I just hadn't paid any attention to it. Of course I seen it, but I don't remember it, it has gone from me."

Counsel for defendant argue that plaintiff's statement that he just hadn't paid any attention to it refers to his failure to look just before he stepped on the materials. But this is not clear, all of his testimony considered.

At another place in his cross-examination he was asked if he had any recollection of seeing any materials when he was over there from four-thirty to five o'clock that afternoon, and whether it was a blank

to him. He said: "Well, it isn't exactly a blank to me, but say it is a kind of a dream, seems more like a dream than anything else."

The plaintiff knew that relaying of rails was being made, and knew that there were materials between the tracks. In crossing from the north to the south track, it was his duty to exercise ordinary care to see the materials and to avoid falling. But, in passing upon the question whether he was guilty of contributory negligence as a matter of law, in failing to see and avoid the obstructions which caused him to fall, and from which he was unable to free himself in time to avoid being struck, it is necessary to take into consideration the character of the obstructions which caused him to fall. Holding, as we have done, that there was substantial evidence that there were wires in the materials, and that plaintiff's feet became entangled in those wires, then, in passing upon this phase of the demurrer, it is necessary to consider what he knew or should reasonably have anticipated as to the presence of wires, and of the dangerous character of wire as an entangling obstruction; and also, the degree of visibility of wires, if connected or mingled with other materials more bulky. The evidence does not conclusively show that plaintiff knew, or should have anticipated, that there were wires in the materials between the tracks, or that as a matter of law he was guilty of negligence in failing to see the wires in time. The men engaged near the west end of the bridge in making replacements and repairs, under the direction of a foreman, quit work for the day at four o'clock.

Counsel call our attention to cases in which recovery was denied to the person heedlessly walking over obstructions which he knew were before him: Waldmann v. Skrainka Construction Co., 289 Mo. 1. c. 633; Woodson v. Met. St. Ry. Co., 224 Mo. 685; Wheat v. St. Louis, 179 Mo. 572; Craine v. Met. St. Railway, 246 Mo. 393; Mullen v. Mercantile Co., 260 S. W. 982, cases not involving the relation of master and servant; and also other cases, wherein it was held that a servant cannot recover where he blindly or heedlessly steps into a place of danger without taking any precautions for his own safety: Degonia v. Railroad, 224 Mo. 564; Williams v. Kansas City Southern Railroad, 257 Mo. 1. c. 114. Necessarily, the conclusion reached in each case of this character must be the result of the application of general rules, to the facts of the particular case. To sustain the demurrer upon the ground under immediate consideration, it is necessary that the evidence plainly show that plaintiff was guilty of negligence in failing to see and avoid the wires. This must appear so clearly, that no reasonable inference to the contrary can be indulged. We cannot so conclude under the facts in this record; and hold that the court committed no error in overruling defendant's demurrer.

It is next claimed that plaintiff's Instruction 1 is erroneous. It is as follows:

"The court instructs the jury that if you find and believe from the evidence that on or about the 26th day of July, 1924, the defendant, ▮▮▮▮▮▮▮▮ Southern Illinois & Missouri Bridge Company maintained the railroad bridge mentioned in evidence and, that plaintiff was employed by the defendant as a watchman and, that it was his duty to remain upon the bridge and to walk across the bridge in both directions using the footway or path along the railroad tracks upon the bridge, if you so find, and if you further believe and find from the evidence that the defendant, through its agents and employees, had negligently placed materials including wire out in said footway and, that said materials including wire were out in said footway, on the 26th day of July, 1924, and that the presence of said materials, including wire out in said footway, if you so find, rendered said footway dangerous and not reasonably safe to plaintiff in the proper performance of his duties, if any, and if you further find and believe from the evidence that on the date aforesaid, plaintiff was upon said bridge at his work; if you so find, and that as the direct result of the negligence of the defendant, if you find it was negligent in placing said materials, including wire out in the footway, if you find it so, and while plaintiff was crossing over the tracks, plaintiff's foot became caught in the wire, if any, causing him to fall upon the track and to be struck by a moving locomotive, and to sustain injuries, and if you further believe from the evidence that plaintiff was at all times mentioned in evidence in the exercise of ordinary care for his own safety, then your verdict must be in favor of plaintiff and against the defendant."

It is first urged that the instruction fails to properly define the duty of plaintiff with respect to furnishing him a safe place to work. Counsel say that the instruction "in effect, tells the jury that if the presence of said materials on the footway rendered said footway not reasonably safe, then plaintiff should recover." The instruction is not fairly susceptible of the construction contended for. It requires the jury to find that the defendant had negligently placed the material including the wire in the footway; that they were in the footway; that the presence of said materials including wire, rendered the footway dangerous and unsafe to plaintiff; that as a direct result of the negligence of the defendant, if found to be negligent in so placing the materials, plaintiff was injured. Thus, while it does not require the jury to find that defendant failed to exercise ordinary care in placing the materials, it does require the jury to find that defendant was negligent in so doing. The whole of the instruction must be considered. The instruction is to be considered in connection with defendant's instructions 3 and 6, which clearly and positively defined the duty of defendant—that defend-

ant's sole duty was to exercise ordinary care to furnish a safe place to work, and that defendant did not insure the safety of plaintiff. Counsel say that defendant's instructions cannot be considered, and do not cure the error alleged, in plaintiff's Instruction 1, citing State ex rel. v. Ellison, 272 Mo. 583; Hall v. Coal & Coke Co., 260 Mo. 351. If plaintiff's instruction had left out the element and requirement of finding of negligence, or had told the jury in effect that it was defendant's absolute duty to furnish plaintiff with a reasonably safe place to work, the objection would be good under the authorities cited. The instruction is to be read with defendant's instructions 3 and 6, which clearly and explicitly defined and limited the duty of defendant, and in effect, defined "negligence" as used in plaintiff's instruction. Taken together, they are not conflicting, but are consistent, and therefore plaintiff's instruction, with the explanation given by defendant's instructions 3 and 6, does not constitute reversible error. [Jablonowski v. Cap Mfg. Co., 312 Mo. 173; Rudy v. Autenrieth, 287 S. W. 850-2.] The next objection made to plaintiff's Instruction 1 is, that it did not follow the allegations of the petition, and did not require a finding that the materials were permitted to remain upon the footway. This objection is not good. The instruction does not, in set terms, require a finding that the materials were "permitted to remain," but it does require a finding that they "had been placed upon the footway," and that on the specific date of plaintiff's injury they were on the footway, and that his injury was caused by such materials, including the wire.

The final complaint is that the court, over objection of defendant, permitted defendant's witness Douglass, conductor of the Missouri Pacific train, to testify on his cross-examination, that when he reached the plaintiff and asked plaintiff how it happened, plaintiff said he "got his feet tangled in wire or something." The conductor testified that his attention was first attracted by the application of the emergency brakes; that as soon as the train stopped, he hurried back to where the plaintiff was, and asked him how it happened, and received the answer mentioned above. The objection made was, that plaintiff's statement was self-serving and hearsay, and not a part of the *res gestae*.

Counsel for defendant say the statement of plaintiff was not a spontaneous exclamation, or one against plaintiff's interest, and therefore was not a part of the *res gestae*. They call attention to Nahorski v. St. Louis Electric Terminal Railway Co., 310 Mo. 1. c. 235; Rosenweig v. Wells, 308 Mo. 1. c. 629; Pryor v. Payne, 304 Mo. 1. c. 567, 574; also to Landau v. Travelers' Insurance Co., 305 Mo. 563; Landau v. Travelers' Insurance Co., 315 Mo. 760. They suggest, apparently by way of distinction, that plaintiff's statement was not made in answer to an inquiry by an agent of this defendant,

but by the conductor of the Missouri Pacific train, a third party. We know of no ground for a distinction based upon that fact. In the Nahorski case, the statement in question was an exclamation made by a third party, not involved in any way in the accident, and merely a spectator. Counsel argue that in this case, the plaintiff had ample time, while the crew of the train was approaching him, to prepare in his own mind a statement fixing liability on the defendant, and excusing himself for failing to get out of the way of the train. The length of time between the occurrence of plaintiff's injury and the making of the statement in question is not shown; no witness undertook to give the time in seconds; but, the evidence does show that the train was stopped as quickly as possible, and that the conductor immediately hurried back to where the plaintiff was. For such a statement to be admissible "it is not necessary that it be precisely contemporaneous with the occurrence which is supposed to have evoked it (Leahy v. Railroad Co., 97 Mo. 172); nor can spontaneity be denied it merely because it was made in response to a question (State v. Martin, 124 Mo. 514)." The foregoing appears in the opinion by RAGLAND, J. in Landau v. Travelers' Insurance Co., 305 Mo. l. c. 575. The Landau case was a suit upon an insurance policy. The vital question in the case was whether the insured's fall from a car was accidental, or intentional. It was there said the admissibility of his statements "depended upon whether they were so spontaneous and so related to the insured's fall as to appear to be a by-product, so to speak, or a reaction of his senses to the physical shock engendered by the fall." The opinion in that case fully sets forth the circumstances; the statements of the insured; the questions asked him by various persons, and his answers or refusal to answer. The conclusion that his statements were properly rejected, was founded upon consideration of the circumstances mentioned—his reluctance to answer, and that such statements as he made were, after a fashion, extorted from him. On that ground it was considered and held that the circumstances negatived the idea of spontaneity on his part in connection with the statements which he did make. Under the circumstances shown in this case, we are unable to say that the statement made by plaintiff that he fell over wire or something, was a statement made as the result of reflection, and of mere self-interest and by way of excuse for failing to get out of the way of the train. We cannot conclusively say that his statement was one born of reflection and calculation and not of the reaction of his senses to the physical shock of contact with the obstruction, the fall, the effort to free himself, and the shock which crushed his hips, all coming in quick succession. We are of the opinion that the senses, other than the sense of sight, might have a reaction peculiar to contact with wires, as distinguished from contact with objects

fixed or bulky. It is our conclusion that the statement was admissible under the rules and tests set forth in the opinion in the Landau case, and other cases; Talbert v. Chicago, Rock Island & Pacific Railway, 284 S. W. 1. c. 504, and other cases heretofore cited.

It is our conclusion that no reversible error is shown, and the judgment is affirmed. *Seddon* and *Ellison, CC.*, concur.

PER CURIAM:—This opinion written by our former Commissioner, the late JAMES D. LINDSAY, is adopted as the opinion of the court. All of the judges concur.